WR-81,148-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/27/2015 3:52:01 PM
Accepted 4/28/2015 8:54:43 AM
ABEL ACOSTA
CLERK

## IN THE STATE OF TEXAS
## DALLAS COUNTY

RECEIVED
COURT OF CRIMINAL APPEALS
4/28/2015
ABEL ACOSTA, CLERK

STATE OF TEXAS

Case No. F03-51313-LW

vs.

ANDREI GLUCK

### NOTICE

### OFFICIAL RECORD ENTRY

In Re:

THE STATE OF TEXAS vs. ADNREI GLUCK F03-51313-LW

FOR AND ON THE RECORD:

### DECLARATION

Dallas County )
) ss.
State of Texas )

I, Andrei Gluck, the declarant herein, hereby declare and affirm under the penalty of perjury, under the laws of the United States of America, in pursuant to Title 28 U.S.C. § 1746, that the following facts are true, correct, complete and not meant to mislead to the best of my knowledge and belief.

Mark declarant's words:

1. On May 7, 2003 undercover Dallas Police officers were conducting an undercover prostitution sting at a local hotel.

2. One of the undercover officers had been given a phone number by an informant. In an effort to schedule a meeting with one of the female

1

escorts, as part of the sting, the officer called the number and spoke to me. After the call, the undercover officer drove to the hotel.

3. Upon his [the undercover officer] arriving at the hotel, I met with the undercover officer on the fourth floor, as he was posing as an interested customer.

4. After a brief discussion between him and me about the details of the service, the undercover officer handed me the money for the escort and I told him to go to a specific room number.

5. Upon my collecting the money, my role was over. I stepped into the elevator, and headed down to the hotel lobby.

6. I walked out of the lobby and, as I was getting into my car, I noticed two men in plain clothes running toward me. My mind naturally processed this as a threat. I did not know that they were undercover police officers. And I did not hear them identify themselves as police officers. As such, I began to pull away from the hotel entrance.

7. I drove only about 20 feet when I noticed the two men in plain clothes running toward my driver-side door, at which time I voluntarily placed my car in park and immediately stopped. Immediately thereafter, I was taken into custody. It was at this point that I was actually able to process what was going on.

03712

8. Stemming from this single incident I was charged with (1) Promotion of Prostitution, (2) Possession of Marijuana, and (3) **Evading Arrest with a Motor Vehicle**.

9. Soon after my arrest, I posted bond on all three charges. Shortly thereafter, I used a telephone to call Brian O'Shea attorney at law. Rather than discuss any details of my arrest, I was instructed to meet Mr. O'Shea at his office.

10. When I arrived at his office we discussed his retainer fee. After that, I explained to him the details surrounding my arrest. In particular, I told Mr. O'Shea that, while I was guilty of Promotion of Prostitution and Possession of Marijuana, I was not guilty of the crime Evading Arrest with a Motor Vehicle.

11. Then, I began laying out exactly what happened on the day of my arrest. I told Mr. O'Shea that I exited the hotel believing the undercover officer, dressed in plain clothes, was a customer, not a police officer. Also, I explained to Mr. O'Shea that I simply got into my car and pulled away without knowledge that I had just been part of an undercover sting. And I repeatedly emphasized that, as I drove away from the entrance, I never heard men yelling that they were

3

police officers. I explained that I did not speed off; I pulled off rather slowly. Moreover, I made clear to Mr. O'Shea that I did not know the men, dressed in regular clothes, were police officers. I explained that my mind was unable to process exactly what was going on at first, as everything unfolded very quickly in real time; and my mind initially processed the men running toward me as a threat. I did not know they were police officers. And I explained that I chose to stop the vehicle and put it in park. In short, I made clear to Mr. O'Shea that I did not intentionally flee from police officers, notwithstanding their account of the facts.

12. During this same initial meeting, in which I fervently maintained my innocence on the Evading Arrest Charge, I did, however, admit guilt on the other two charges stemming from that incident. Importantly, I asked him to obtain the surveillance video from the hotel lobby or parking lot, as the video would, in my opinion at the time, be powerful evidence of my innocence on that particular charge, Evading Arrest with a Motor Vehicle, thereby corroborating my factual account. I believed it would clear me on that charge.

13. After the initial meeting between Mr. O'Shea and me, I paid his retainer fee and he said he would be in contact. I was confident that

03714

Mr. O'Shea would get the surveillance video that I requested. Then, after a few continuances, I was told to appear at the courthouse, Dallas County, concerning the Evading Arrest charge as well as a separate Possession charge, stemming from a separate incident. I had not spoken to Mr. O'Shea since our initial meeting, during which I laid out the facts and requested the surveillance video from the hotel. When I arrived, Mr. O'Shea met me outside the courtroom, in the hallway, and told me that he had a very good deal for me.

14. Mr. O'Shea then explained that he had negotiated a plea bargain for me. But I pointed out that I was not guilty of Evading Arrest with a Motor Vehicle. I maintained my innocence on that charge. But Mr. O'Shea persisted and started to discuss with me another crime I had been charged with, stemming from a different incident. That charge, Possession of a Controlled Substance (Case No. F-0351313), stemmed from my conduct which occurred about two months after the alleged Evading Arrest. So Mr. O'Shea reasoned that it did not matter if I was not guilty on the Evading Arrest charge. Mr. O'Shea said that I would be wasting my time fighting the Evading Arrest charge, because, he explained, I still had to dispose of the Possession of a Controlled Substance (Case No. F-0351313) charge. And I had admitted guilt on

5

that charge. Further, Mr. O'Shea went on to explain that the prosecutor was offering 180 days in jail on both charges, the Evading Arrest and the Possession charge. Mr. O'Shea explained it to be a package deal, whereby I would get 180 days in jail on both charges, to be run concurrently. So Mr. O'Shea stressed that the fact that the Evading Arrest conviction was meaningless, in view of the other Possession charge. He sold it to me by stressing the Evading Arrest conviction would be irrelevant, as it would simply be run concurrently with the Possession charge. He kept saying that I had to make a decision immediately or the deal would be taken off the table, and that everybody was waiting on me. He seemed to be in a rush.

15. This prompted me to ask Mr. O'Shea about the surveillance video from the hotel parking lot or lobby. But he was extremely dismissive about even making an attempt to obtain the surveillance video. And Mr. O'Shea advised me again that it [the surveillance video] didn't matter, he never tried to get it, because, in any event, I was going to have to serve the same amount of jail time on the Possession charge. Mr. O'Shea was very aggressive in his position about how the Evading Arrest conviction did not matter, as the sentence would be run together with the sentence given for the Possession charge.

6

16. During this same conversation in the hallway of the courthouse, Mr. O'Shea continued to hard-sell me on pleading guilty to the Evading Arrest, despite my repeated assertions that I was innocent of the crime, and despite my repeated requests that he attempt to obtain the surveillance video, a crucial piece of evidence. At this point I felted anxious and hurried and put off by Mr. O'Shea.

17. Mr. O'Shea said that if I refused the plea offer that I was going to upset the prosecutor and that I would most likely end up with a 20-year prison sentence for the Evading Arrest charge.

18. Mr. O'Shea's sole focus at this point was to get me to waive my right to a jury trial and to plead guilty, nothing else mattered; and nothing I said mattered.

19. Then Mr. O'Shea pulled out the written plea agreement associated with the Evading Arrest charge and started trying to explain it to me. Everything happened very quickly, as we were sitting outside of the courtroom in an extremely crowded, noisy hallway.

20. He went on to explain to me in a very hurried way something about how the court can actually reduce my felony Evading Arrest Charge

7

03717

to a misdemeanor. But to reduce it to a misdemeanor, I had to waive my right to a jury trial and plead guilty. The whole thing was rushed and a bit confusing.

21. Based on this hurried and rather confusing conversation with Mr. O'Shea, I believed that my evading arrest charge was actually going to be reduced to a Class A misdemeanor and that I was actually pleading guilty to a Class A Misdemeanor.

22. Because of this belief, when Mr. O'Shea gave me a pen to fill out the Plea Agreement, I made clear that I was pleading guilty to Evading Arrest Class A Misdemeanor, as evidenced by my written statement on the plea agreement. See Exhibit "1." Upon my making this written statement, Mr. O'Shea reviewed it and was satisfied with what I had written.

23. The whole process was hurried and confusing. While I was signing the paperwork that Mr. O'Shea handed me in relation to my guilty plea, he started walking me through what was going to happen next.

03718

24. Mr. O'Shea explained that we were going to go into the courtroom to see the judge, at which time the judge was going to ask me a series of questions. Mr. O'Shea instructed me to, no matter what, just go along with all the judges questions. Mr. O'Shea advised me not to try to explain anything to the judge. Mr. O'Shea told me that it was part of the process. Mr. O'Shea said not to tell the court that I was not guilty of the Evading Arrest charge, because it would just upset the judge as well as everyone else involved and that, as a result, I would lose the "great deal." He stressed that I just needed to agree to the facts that were going to be put before the court, even if I felt differently or even if they were not true. Mr. O'Shea explained that if I did not go along with everything that I would blow the deal and most likely end up with a 20-year prison sentence for the Evading Arrest charge.

25. After Mr. O'Shea coached me on what to say, I went into the courtroom feeling very uneasy and ultimately entered my guilty plea to the evading arrest charge as well as the Possession of a Controlled Substance charge (stemming from a separate incident).

03719

26. During the plea hearing, acting on the instructions that Mr. O'Shea gave me out in the hallway of the courtroom, I simply did as he advised and just went along with all of the court's questions, as Mr. O'Shea was standing next to me.

27. Acting on Mr. O'Shea's advice, I entered my guilty plea to a crime, Evading Arrest, of which I was not guilty. And acting on Mr. O'Shea's advice, I went along with the court's questions by answering them as Mr. O'Shea had instructed me, even though some of my answers were factually untrue and contrary to the events surrounding my Evading Arrest charge.

28. Upon my pleading guilty to the Evading Arrest and Possession charge, the court sentenced me to 180 days in jail on each offense and ordered them to run concurrently.

29. Despite Mr. O'Shea's repeated comments that it didn't matter if I waived my right to a jury trial and pled guilty to the Evading Arrest charge, (in spite of my innocence) because I was going to have to serve jail time on the other Possession charge anyway, I am currently

10

03720

serving a federal sentence that was dramatically enhanced – from about 6 years to nearly 18 years' imprisonment – on the basis of that very Evading Arrest conviction, as the federal courts recognize Evading Arrest with a motor vehicle as a **violent** felony.

30. Mr. O'Shea failed to perform an adequate pretrial investigation and specifically attempt to procure the surveillance video from the hotel parking lot or lobby, which could have cleared me of the Evading Arrest charge. Had Mr. O'Shea taken the time to perform an adequate pretrial investigation and procure the surveillance video, instead of insisting that I waive my rights, the charges likely would have been dismissed or I could have opted for a jury trial and fashioned a defense around the surveillance video, powerful physical evidence in my favor.

31. Mr. O'Shea's sole duty in relation to my Evading Arrest charge was to execute a waiver of my right to jury trial.

32. While Mr. O'Shea was present, his ineffectiveness was so egregious that I was in effect denied any meaningful assistance of counsel at all.

11

03721

33. Had it not been for Mr. O'Shea's errors, I would have insisted on going to trial in relation to the Evading Arrest charge.

I, _____Andrei Gluck_____, do hereby swear under the penalty of perjury pursuant to Title 28 United States Code § 1746, that the foregoing is true and accurate, to the best of my recollection, and made for no improper reasons.     Dated: _____4/20/15_____

_____
Andrei Gluck
P.O. Box 4050
Pollock, Louisiana 71467

12

03722